RONALD E, JOLLEY and CHARLOTTE A. JOLLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jolley v. Commissioner
Docket No. 10467-80.
United States Tax Court
T.C. Memo 1984-70; 1984 Tax Ct. Memo LEXIS 603; 47 T.C.M. (CCH) 1082; T.C.M. (RIA) 84070; February 13, 1984. Robert Joe Hull, for the petitioner. Karl D. Zufelt, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT *604 AND OPINION WILBUR, Judge: Respondent determined a deficiency of $5,928 in petitioners' 1976 Federal income tax. The issue for decision is whether petitioners are entitled to deduct $6,048 in 1976 for prepaid intangible drilling and development costs (IDC). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Newport Beach, California at the time of filing their petition herein and filed a joint Federal income tax return for the calendar year 1976. In December 1976, petitioner Ronald Jolley (hereinafter petitioner) as a limited partner, contributed capital consisting of $6,750 in cash in the formation of a limited partnership known as Crockett County Development Drilling Program I (hereinafter the partnership). The general partner of the partnership was Lifestyle-University Venture (Venture), a general partnership composed of Lifestyle Energy Corporation (Lifestyle) and University Investment Management Corporation (University). Lifestyle was a Texas corporation engaged in the business of initiating, managing, and operating *605 oil ventures. University was a California corporation engaged in investment services, primarily in the real estate area. Lifestyle and University had no common shareholders, officers, or directors and had no business dealings with each other prior to the formation of the Venture. Limited partnership interests in the partnership were offered in December 1976 through a private placement memorandum. The capital contributions of the limited partners consisted of cash totalling $216,000. Venture, a general partner, contributed its interest in an oil and gas lease located in Crockett County, Texas, which lease had been contributed to Venture by Lifestyle as part of its capital contribution. The objectives of the partnership were set out in the private placement memorandum as follows: The investment objectives of the Limited Partnership are to drill three development oil wells in Texas to provide cash distributions to its partners from the production of oil. In addition, through the deduction of a substantial portion of the Limited Partners' capital contribution as intangible drilling and development costs, each partner will recognize a deduction for Federal income tax purposes for *606 1976 of a substantial portion of his capital contribution. The private placement memorandum included a proposed operating agreement (described infra) whereby Lifestyle (referred to therein as "Energy"), would agree to drill three wells on a turnkey basis in exchange for $195,000. The memorandum stated that: [T]his is a firm commitment of Energy to drill and test these wells for this price. Energy represents and will submit a letter to the Limited Partnership that this is a fair price for these services and not greater than competitive comparable, arms length arrangements. Energy expects to realize a profit on this turnkey price although such profit, if any, cannot be determined in advance. The partnership was formed on December 30, 1976 and a certificate of limited partnership was filed on that date. On the same date and in accordance with the private placement memorandum under which the partnership was formed, the partnership executed the operating agreement with Lifestyle which provided, in pertinent part, as follows: Lifestyle, as the Operator, agrees to drill and test three (3) wells on the Lease to a maximum depth of 2,500 feet or to a depth sufficient to test *607 the San Andres formation, for a turnkey drilling price of One Hundred Ninety Five Thousand Five Hundred Dollars ($195,500.00). The payment of said turnkey price shall be made to Lifestyle pursuant to the terms of the Escrow Agreement attached hereto as Schedule 2. The escrow agreement, executed on December 6, 1976, provided, in pertinent part, as follows: I DEPOSIT OF FUNDS
University agrees that upon the execution of the Limited Partnership Agreement by all of the Limited Partners, University will deposit the sum of Two Hundred Sixteen Thousand Dollars ($216,000.00) with the Escrow Agent as the capital contributions of the said partners. II DISBURSEMENT OF FUNDS HELD IN ESCROW
The parties agree that the sums held in escrow will be disbursed as follows: (a) The sum of Eighteen Thousand Three Hundred Sixty Dollars ($18,360.00) shall be disbursed to University immediately upon the receipt of the total capital contribution to be deposited in escrow. (b) The sum of Two Thousand One Hundred Forty Dollars ($2,140.00) shall be disbursed for organizational expenses as directed by the General Partner of the Limited Partnership. (c) The sum of One Hundred Ninety *608 Five Thousand Five Hundred Dollars ($195,500.00) shall be disbursed to Energy upon receipt of written notification from Energy that it has commenced drilling the wells on the property of the Limited Partnership or on December 30, 1976 whichever occurs first. * * * On December 30, 1976, the partnership, acting through an escrow agent, paid $195,500 to Lifestyle for the drilling of three proposed wells, on a turnkey basis, on the lease transferred to the partnership. In addition, the partnership dispensed $2,140 in organizational expenses and $18,360 as a sales commission to University Securities Corporation, a securities broker-dealer affiliated with University. Lifestyle did not own drilling equipment and did not conduct drilling and exploration activities in its own capacity, but rather contracted with independent drillers for such activities. On March 22, 1977, Lifestyle executed a footage and dayrate drilling contract with Texland Drilling Corporation for the drilling of the three proposed wells on the partnership lease. The contract provided that payment was due on completion of drilling, but charges for daywork would be due at the end of the month in which services had *609 been rendered if drilling had been commenced but not completed. In addition, Texland agreed to use its best efforts to commence operations for the drilling of the well "by the 1st day of April, 1977, or as soon thereafter as possible." Drilling of the three wells commenced after March 22, 1977, and was completed by May 1977, after which time Lifestyle paid Texland the charges specified in the contract. In its 1976 partnership return, the partnership claimed a deduction for intangible drilling expenses in the amount of $195,500, which gave rise to a net loss of $195,500 for 1976. Petitioner's distributive share of the partnership losses for 1976 was 3.09375 percent. On his 1976 income tax return, petitioner deducted $6,048 as his distributive share of partnership loss. OPINION In December 1976, petitioner purchased an interest in a cash basis oil and gas limited partnership. The general partner of the partnership was a joint venture between Lifestyle and University. On December 30, 1976, the partnership entered into a turnkey contract with Lifestyle whereby Lifestyle agreed to drill three wells on a lease which the general partner had contributed to the partnership. On *610 the same date, the partnership prepaid the turnkey charges to Lifestyle pursuant to the terms of this contract and an escrow agreement executed prior thereto. Lifestyle contracted out the drilling to a subcontractor who completed the work in May 1977. The partnership deducted the prepayment as intangible drilling costs in 1976 and the petitioners, in turn, deducted their proportionate share of such costs on their 1976 return. The issue for decision is whether petitioner is entitled to a deduction in 1976 for his share of IDC which the partnership claimed that year as a result of a turnkey agreement entered into with Lifestyle. Since petitioner was a limited partner in the partnership, the timing of petitioner's deductions is determined by the timing of the partnership's deduction. Resnik v. Commissioner,66 T.C. 74 (1976), affd. 555 F.2d 634 (7th Cir. 1977). Petitioner contends that since the turnkey amounts were in fact paid in 1976 by the partnership pursuant to an arm's-length agreement and for a valid business purpose, the deduction was properly taken in that year. Petitioner argues that the partnership received its bargained-for benefit *611 in 1976 since prepayment effectively locked in the price for the drilling and shifted the risk of drilling to Lifestyle. In addition, petitioner asserts that deduction of the prepayment in 1976 did not materially distort income since the drilling of the wells was actually completed within the next taxable year, citing the "one-year rule" recently set forth by the Ninth Circuit in Zaninovich v. Commissioner,616 F.2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978) and Commissioner v. Van Raden,650 F.2d 1046 (9th Cir. 1981), affg. on a different ground 71 T.C. 1083 (1979). Respondent contends, however, that the transfer of funds to Lifestyle lacked any valid business purpose and should be disregarded for tax purposes. He claims, in accordance with Rev. Rul. 80-71, 1980-1 C.B. 106, that the deduction in 1976 was premised on a mere shifting of funds to a related entity acting only as nominal drilling contractor and resulted in a substantial distortion of income under section 446(b). We agree with petitioner. *612 Section 263(c)[1] directs the Commissioner to prescribe regulations corresponding to prior regulations which had granted taxpayers the option to expense intangible drilling and development costs. Section 1.612-4, Income Tax Regs., which implements section 263(c), provides that intangible drilling and development costs incurred by an operator in the development of oil and gas properties may at the taxpayer's option be chargeable to capital or to expense. The regulation provides that intangible drilling and development costs "include the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts." We considered the issue of deductibility of prepaid IDC of a cash basis partnership in Keller v. Commissioner,79 T.C. 7 (1982), affd.     F. 2d     (8th Cir. 1984), which was decided subsequent to the briefing of the issues in this case. In Keller, the taxpayer was a limited partner in a program partnership *613 which, in turn, was a limited partner in a drilling partnership. In December 1973, the drilling partnership transferred sums to various drilling contractors and service companies pursuant to numerous prepaid footage and daywork drilling contracts, third-party well-servicing contracts, and turnkey contracts. The drilling partnership elected to expense the prepaid IDC in 1973 but the Commissioner disallowed deductions for such amounts. We set forth a two-part test for determining the deductibility or prepaid IDC by cash basis taxpayers, namely (1) whether the expenditure was a true payment rather than a refundable deposit; and (2) whether the prepayment resulted in a material distortion of income. [2] We stated that "the material distortion analysis mandated by section 446(b) must include a substantial consideration of the business purpose aspects of the transaction." 79 T.C. at 28. In applying such test to the prepayment, we held that part of the amounts prepaid in 1973 pursuant to both the footage and daywork contracts and third-party well-servicing contracts was in the nature *614 of "deposits" since the partnership had a unilateral right to a refund of these amounts. Such prepayment was therefore not deductible. [3]
We reached a different conclusion with respect to the prepaid turnkey contracts. We first found that the amounts prepaid pursuant to the turnkey contracts were true payments rather than deposits since the partnership did not retain a unilateral power to recover such amounts. Second, we found that the *615 prepayments clearly reflected income and were fully deductible in the year of payment. We explained: We base this conclusion on the unique characteristics of the turnkey contract. An owner pays a significant premium to a driller to get a turnkey obligation, as contrasted with a footage and daywork contract. The turnkey contract obligates the driller to drill to the contract depth for a stated price, regardless of the time, materials, or expenses required to drill the well. The turnkey contract thus locks in prices. It also shifts the drilling risks from the owner to the driller. By signing and paying the turnkey obligation, the drilling partnership knew that, as far as it was concerned, the well was drilled. Therefore, we find that the partnership effectively got its bargained for benefit in the year of payment. Accordingly, cash basis taxpayers, like the drilling partnership, properly may deduct turnkey payments in the year of payment. [79 T.C. at 47] We find Keller to be dispositive of the issue presented herein. [4] The operating agreement entered into between the partnership and Lifestyle was a turnkey contract. Upon payment of the turnkey amounts, *616 the price of drilling the three wells was effectively "locked in" and the risk of drilling shifted to Lifestyle. Thus, on December 30, 1976, petitioner and the other limited partners knew precisely the amount of capital they would be required to invest for the initial drilling of the wells and that the risk of any increase in the cost of drilling from that time until the actual commencement of drilling would be borne by Lifestyle. There was no provision for refund and the partnership did not retain any unilateral right to a refund of the prepayments. Thus, by signing the operating agreement and paying the turnkey obligation, the partnership received its bargained-for benefit in 1976 and in accordance with our holding in Keller with respect to turnkey contracts, such payments are deductible in 1976. *617 Respondent however asserts that the transaction lacked economic substance. He argues that (a) the contract was not at arm's-length since Lifestyle was a related party and (b) that Lifestyle was not the actual driller but merely an accommodating party who agreed to secure a driller for the specified wells at an undermined time. However, under the instant operating agreement, Lifestyle gave the partnership a firm commitment that the specified wells would be drilled regardless of actual cost and the partnership received a contractual right to have the wells drilled in exchange for their prepayment. That Lifestyle was a related party and not the actual driller did not affect its obligation to perform under its contract with the partnership. In fact, the wells were actually drilled in the first half of the following taxable year. [5] Thus in line with our decision in Keller, the prepayment is deductible as IDC in 1976. See also Dillingham v. United States, an unreported case ( W.D. Okla. 1981, 48 AFTR 2d 81-5815, 81-2 USTC par. 9601); Pauley v. United States, an unreported case ( S.D. Cal. 1963, 11 AFTR 2d 955, 63-1 USTC par. 9280). [6]
*618 Decision will be entered for the petitioners.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. We initially determined in Keller that sec. 446(b) is applicable to IDC and may be used by the Commissioner to determine the proper timing of the expense deduction for prepaid IDC. Keller v. Commissioner,79 T.C. 7, 38-41 (1982), affd.     F.2d     (8th Cir. 1984)↩. 3. The partnership also prepaid $147,691.38 to supervise the drilling of the wells. We found that no business purpose existed for the prepayment of such charges because the operator was already obligated to provide the partnership with the same services at the same price regardless of the prepayment and thus upheld the Commissioner's determination that such deduction materially distorted the partnership's income. 79 T.C. at 44-45↩.
4. The same conclusion was reached in Pauley v. United States, an unreported case ( S.D. Cal. 1963, 11 AFTR 2d 955, 63-1 USTC P9280), and in Dillingham v. United States, an unreported case ( W.D. Okla. 1981, 48 AFTR 2d 81-5815, 81-2 USTC P9601). The courts there found that the general contractor required the prepayment to provide him with working capital for the drilling. See Dillingham v. United States, 48 AFTR 2d at p. 81-5817, 81-2 USTC at p. 88,012; Pauley v. United States, 11 AFTR 2d at p. 959, 63-1 USTC at p. 87,656. In the instant case, Donald H. McClellan, president of University, testified that University negotiated the agreement with Lifestyle on behalf of the limited partners and that in the course of negotiations, Lifestyle required the prepayment in order for them to secure a commitment from the driller. However, without regard to such testimony, we think that the business purpose inherent in the nature of turnkey contracts (i.e., locking in the price, shifting the risk) in sufficient to uphold the taxpayer's election to expense amounts paid pursuant to such contracts in the year of payment. Keller v. Commissioner,79 T.C. 7, 47 (1982), affd.     F.2d     (8th Cir. 1984). (1982). See also Dillingham v. United States,supra, where the district court, in its findings, emphasized such business purpose: 13. The partnership agreement for each Drilling Partnership specified that the drilling of wells would be conducted by Basin as General Contractor on a fixed price or turnkey basis. This arrangement was a selling point in the offering of interests to investors because it protected assets of the Drilling Partnerships and the investors' share of production revenues from liabilities for cost overruns that might occur due to blowouts or other catastrophies during drilling and completion or abandonment of the wells. [48 AFTR 2d at p. 81-5817, 81-2 USTC at pp. 88,011-88,012]. The decisions in Pauley v. United States,supra, and Dillingham v. United States,supra, are discussed in Keller v. Commissioner at 79 T.C. at 36-37↩.
5. See Dillingham v. United States,supra, where the district court allowed the deduction of prepaid IDC in the year of payment despite the fact that the payment was made to a related party (the general partner). The court stated: In this case, although the contract which requires prepayment is between related parties, the Court finds that the contract is an enforceable contract of economic substance which Basin had a fiduciary duty as well as a contractual duty to perform. The investor was assured of a turnkey price. Prepayment is the usual practice on turnkey contracts. Basin received working capital. At the same time, Basin was required to drill the wells within a reasonable time. [48 AFTR2d at p. 81-5819, 81-2 USTC at p. 88,014.] ↩
6. The parties argued extensively regarding the proper application to this case of the "one-year rule" adopted by the Ninth Circuit in Zaninovich v. Commissioner,616 F. 2d 429 (9th Cir. 1980), revg. 69 T.C. 605 (1978) and again in Commissioner v. Van Raden,650 F.2d 1046 (9th Cir. 1981), affg. on a different ground 71 T.C. 1083 (1979). Such rule, based on the converse of sec. 1.461-1(a)(1), Income Tax Regs. ("If an expenditure results in the creation of an asset having a useful life which extends substantially beyond the close of the taxable year, such a expenditure may not be deductible, or may be deductible only in part, for the taxable year in which made") allows a full deduction in the year of prepayment where that payment creates an asset having a useful life of one year or less from the day of payment. In Zaninovich, the prepayment was for one year's rent while in Van Raden the prepayment was for the purchase of cattle feed which was consumed within one year. In the instant case, it is not entirely clear whether the "one-year rule" is applicable. In this connection, we observe that the wells were drilled within one year from the prepayment date although the drilling contract did not require that the drilling be completed within one year. See Keller v. Commissioner,supra,79 T.C. at 40, n. 24); see also Klueger, "Deductibility of 'Prepaid' Intangible Drilling and Development Costs," 30 Oil & Gas Q. 431, 440-441 (Sept. 1981). However, in view of our conclusion herein that the prepayments are deductible under our decision in Keller,↩ we need not address this point.